NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 81

No. 2018-362

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Clyde S. Bovat | May Term, 2019 |

David R. Fenster, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Samantha V. Lednicky of Murdoch Hughes Twarog Tarnelli, Burlington, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **SKOGLUND, J.** Defendant, Clyde Bovat, was convicted of shooting a deer in violation of Vermont big-game-hunting laws and failing to immediately tag the deer. On appeal he claims the trial court erred in denying his motion to suppress evidence allegedly obtained in violation of his constitutional right to be free from warrantless government intrusions. For the forthcoming reasons, we affirm.

¶ 2. In the early morning hours of Thanksgiving 2017, a resident of Huntington, Vermont was awoken by a gunshot close to his home on Hinesburg Hollow Road. The concerned resident called the state game warden to report a possible deer jacking. The warden arrived at the scene and spoke with the resident, who advised that the gun shot woke him shortly before 4:00 a.m. and that it rattled his windows. The resident said that he looked out his window and saw a dark-colored truck with "running lights on top." A preliminary search by the warden revealed no

evidence of a deer jacking.  The warden returned later that morning, at approximately 7:00 a.m., to inspect the scene more closely and located deer tracks along the southern shoulder of the road. At the approximate location the resident had described seeing the truck parked, the warden found what he believed to be deer hair and blood.  He collected samples for evidence.

¶ 3.    In the course of the investigation, the warden interviewed E.S., who reported shooting a six-point buck at 7:00 a.m. on Thanksgiving morning in Hinesburg.  After some equivocation, E.S. informed the warden that he had not shot the deer and that defendant had sold him the deer carcass at "Clark's Barn."  The partially butchered carcass was seized as evidence. Then the warden, along with other law enforcement officers, went to defendant's residence to investigate further.

¶ 4.    Law enforcement officers proceeded up defendant's driveway to the two-bay detached garage.  Through a window in the garage door, the wardens observed the rear tailgate and license plate of defendant's black pickup truck.  The wardens also saw what appeared to be deer hair and blood on the top of the truck's rear tailgate, which was "approximately one arm's length" from the wardens' vantage point.  As the tailgate was closed, the wardens were unable to see into the bed of the truck or the interior side of the tailgate.

¶ 5.    The wardens went to defendant's front door, spoke with his wife, and asked for her permission to enter the garage.  Defendant's wife said that she couldn't find the key and was therefore unable to open the garage door.

¶ 6.    Based in part on their observations through the garage window, the wardens obtained a search warrant to seize defendant's truck and collected samples of the blood they had observed, which matched a sample from the deer at issue.  They did not photograph the truck until approximately five days after the seizure, during which time the truck had been left outside in inclement weather.  Due to exposure to the elements, a smaller amount of blood than originally observed was visible, and the deer hair was no longer visible.

2

¶ 7. Prior to trial, defendant sought to suppress the evidence obtained through the search warrant, arguing that: (1) his garage falls squarely within the curtilage of his home and is protected from warrantless government intrusions; (2) law enforcement had no lawful basis to peer through his garage window; (3) even if the garage is not within the curtilage of his home, sufficient steps were taken to exclude its interior from public view; (4) absent the unlawful intrusion into his garage, there was no probable cause to issue a search warrant and the evidence obtained must be suppressed; and (5) the warden included false and misleading statements as well as material omissions in his affidavit of probable cause.

¶ 8. The trial court denied the suppression motion. The court held that the garage, which "is located a significant distance from the home, . . . separated by a row of trees" and a small stone wall, was not part of the curtilage. However, the court noted that even if the garage was part of the curtilage, the warden had a legitimate right to be on defendant's driveway and the garage window was in plain view, emphasizing that the wardens entered the driveway to conduct legitimate police business.

¶ 9. On appeal, defendant argues that the court erred in denying his motion to suppress because: (1) his garage is within the curtilage of his home; (2) his truck's tailgate and license plate were not clearly visible from a lawful public vantage point; and (3) the warden included false or misleading statements and material omissions in his affidavit in support of the search warrant which constituted a Franks violation. See Franks v. Delaware, 438 U.S. 154 (1978).

¶ 10. We agree with defendant that his garage is within the curtilage of his home. We are unpersuaded by his remaining arguments. The wardens were conducting a legitimate police investigation, during which they observed defendant's truck in plain view from a semiprivate area. We decline to address the merits of defendant's Franks challenge because the challenged

statements were not necessary to the probable cause to issue a search warrant.[1]  Accordingly, we affirm.

¶ 11.    When reviewing a motion to suppress, we review the trial court's factual findings for clear error.  State v. Dubaniewicz, 2019 VT 13, ¶ 14, __ Vt. __, 208 A.3d 619.  The trial court's findings are upheld unless there is no reasonable or credible evidence to support them.  State v. Weisler, 2011 VT 96, ¶ 6, 190 Vt. 344, 35 A.3d 970.  If the trial court's findings are not clearly erroneous, we then review the legal issues de novo.  Id. ¶ 7 (citation omitted).

¶ 12.    First, defendant argues the trial court erred in concluding that his garage is not in the curtilage of his home.  Yes, this was error.  Curtilage is defined as "the land immediately surrounding the home and associated with it," State v. Byrne, 149 Vt. 224, 227, 542 A.2d 276, 278 (1988), into which the " 'privacies of life' may extend," State v. Rogers, 161 Vt. 236, 241, 638 A.2d. 569, 572 (1993) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  The United States Supreme Court has identified four factors to aid in determining if an area is curtilage: (1) the area's proximity to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature and uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation.  United States v. Dunn, 480 U.S. 294, 301 (1987).  These factors do not produce a "finely tuned formula" that can be mechanically applied; rather, they bear upon the central consideration of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id.  Vermont adopted the Dunn factors in State v. Hall, 168 Vt. 327, 330, 719 A.2d 435, 437 (1998), after first applying them in Rogers, 161 Vt. at 242 n.*, 638 A.2d at 572 n.*.

---

[1]  To succeed on a Franks challenge, defendant must show by a preponderance of the evidence that the government agent intentionally, knowingly, or with reckless disregard for the truth, included false information or omitted material information in the affidavit.  438 U.S. at 155-56.  Here, defendant's Franks challenge is of no moment.  Sufficient evidence supported the warrant without consideration of any of the alleged omissions or misleading statements and the claimed omissions or misleading statements would not affect the probable cause determination.

¶ 13.    The Dunn Court found that the barn in question in that case was a substantial distance from the house (sixty yards away), it did not lie within the area surrounding the house that was enclosed by a fence, law enforcement had objective data that the barn was not being used for intimate activities of the home, and the defendant had done little to protect the barn area from observation by those standing in the open fields around the structure.  480 U.S. at 302-03.  Based on these findings, the Court concluded the barn was not within the curtilage of the home.  Id. at 301.

¶ 14.    Following the Dunn analysis, this case calls for a different result.  First, defendant's garage and home are in close proximity to one another, separated only by an area of driveway that can accommodate approximately two vehicles and plastic garbage bins, and a small row of trees. While the trial court found the distance "significant" from viewing aerial photographs admitted at hearing, the photographs actually depict a continuity of space with a "walking path" to the house from the driveway.  Second, a low, white split-rail fence stands along the road but, as the trial court found, it does not enclose anything.  It begins along one side of the driveway and continues off toward an open field away from the residence.  The fence does not separate the garage from the home in any way.  Third, defendant uses the garage for domestic purposes—parking his vehicles and storing his hunting equipment.  Finally, while defendant did not prevent observation of the garage itself by placing barriers or "no trespassing" signs, the garage door was closed and locked. The garage is properly considered to be within the curtilage of the home.

¶ 15.    We have held that curtilage includes outbuildings such as sheds and garages used for domestic purposes.  State v. Potter, 148 Vt. 53, 61, 529 A.2d 163, 168 (1987) (determining that defendant's shed was part of curtilage because it was outbuilding used for storing family property). Here, defendant's garage merited "the same constitutional protection from unreasonable searches and seizures as the home itself."  Rogers, 161 Vt. at 241, 638 A.2d at 572; see also State v. Bryant, 2008 VT 39, ¶ 13, 183 Vt. 355, 950 A.2d 467.

¶ 16.   We nonetheless conclude that the warden's plain-view observations through the window of the garage from a place he had a right to be did not violate defendant's Fourth Amendment rights.  In State v. Koenig, we held that Fourth Amendment protections extend only to items which are not in plain view and cannot be seen by persons from a place they have a legitimate right to be.  2016 VT 65, ¶ 15, 202 Vt. 243, 148 A.3d 977 (citing United States v. Orozco, 590 F.2d 789, 792 (9th Cir. 1979)).  The plain-view exception applies here.

¶ 17.   The plain-view doctrine is grounded on two principles: "first, 'that when a police officer has observed an object in plain view' from a legal vantage point the owner's privacy interests are forfeited; and second, that requiring a warrant once the police 'have obtained a first-hand perception of [the object] would be a needless inconvenience.' "  State v. Bauder, 2007 VT 16, ¶ 30, 181 Vt. 392, 924 A.2d 38 (quoting Texas v. Brown, 460 U.S. 730, 739 (1983)).

¶ 18.   Regarding the first prong—that the police officer observes the object from a legal vantage point—we have previously stated that "police officers are entitled to enter residential property, including portions that would be considered part of the curtilage, to carry out legitimate police business."  Koenig, 2016 VT 65, ¶ 16.  Portions of the curtilage like driveways or walkways, which are normal access routes for anyone visiting the premises, are considered semiprivate places.  State v. Pike, 143 Vt. 283, 287, 465 A.2d 1348, 1351 (1983) (citing United States v. Magana, 512 F.2d 1169, 1171 (9th Cir. 1975)); State v. Ryea, 153 Vt. 451, 453, 571 A.2d 674, 675 (1990); see also State v. Libbey, 154 Vt. 646, 646, 577 A.2d 279, 280 (1990) (mem.) ("We have found a significant difference between private areas within the curtilage of the home, and semiprivate areas, such as a driveway, steps and a walkway.").  When state officials restrict their movement to semiprivate areas to conduct an investigation, "observations made from such vantage points are not covered by the Fourth Amendment."  Pike, 143 Vt. at 288, 455 A.2d at 1351 (citing United States v. Humphries, 636 F.2d 1172, 1179 (9th Cir. 1980)).  In other words, a private area may still be open to visual inspection from a semiprivate area.  See Rogers, 161 Vt. at 248, 638 A.2d at 578 (finding that trooper did not violate Fourth Amendment while "standing in a position from

6

which he could lawfully make an observation" into defendant's garden within curtilage). Here, while the garage itself is a private area that the police would not have been justified to enter without a warrant, the wardens restricted their movements to defendant's driveway, a semiprivate area, where they observed what they believed to be incriminating evidence on defendant's truck. Because the wardens observed the truck from a legal vantage point, the first part of the plain-view exception is met.

¶ 19.    An object must also be in plain view. Bauder, 2007 VT 16, ¶ 30.  "Where the government observes that which is willingly exposed to the public, there is no invasion of privacy." Koenig, 2016 VT 65, ¶ 15.  A person can reassert privacy interests in semiprivate areas by posting 'no trespassing' signs or erecting barriers to apprise others that the area is private.  State v. Kirchoff, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991).  When a landowner has taken steps to indicate that strangers are not welcome, such that a reasonable person would conclude that the public is excluded from the land, an expectation of privacy is reasonable.  Id.; State v. Blow, 157 Vt. 513, 517, 602 A.2d 552, 555 (1991).  However, absent evidence of intent to exclude the public, and when the police officer can readily observe the object from a lawful vantage point, the plain-view requirement is met.  This is true here.

¶ 20.    Defendant urges us to analogize the present case to State v. Ford, 2010 VT 39, 188 Vt. 17, 998 A.2d 684.  We decline to do so.  In Ford, an officer performing a welfare check walked around the defendant's house, bent down to a basement window, and saw marijuana plants under a grow-light through a gap in the curtains.  Id. ¶¶ 3-4.  However, that case looked at whether the emergency-aid exception applied under the facts of the case and did not address the plain-view exception at issue here. See id. ¶ 6.  Moreover, there was no claim in Ford that the officer saw into the basement window from a semiprivate place that was a normal access route for visitors to the premises.  See id. ¶¶ 9, 21.

¶ 21.    We are also unconvinced by defendant's argument that his detached garage, with closed doors, connotes a reasonable expectation of privacy.  Defendant did little, if anything, to

7

indicate that expectation. As the trial court found, the garage was not in an enclosure. Defendant posted no signs and erected no large barriers around his garage. And, as the trial court found, the "small white split-rail fence does not protect the area from observation in any way." The windows in the garage doors were not covered or blocked in any way. Any adult standing on defendant's driveway could see into the interior of his garage where his truck was parked because nothing was done to prevent someone from seeing into the garage from the driveway.

¶ 22.    Defendant also relies on Collins v. Virginia, 138 S. Ct. 1663, 1668 (2018), where an officer investigating a traffic infraction and theft uncovered a suspect vehicle from under a tarp on the defendant's driveway. Without a warrant, the officer removed the tarp, ran the license plate number, and photographed the uncovered vehicle. Id. The United States Supreme Court held that the officer's actions invaded defendant's Fourth Amendment interests in the curtilage of his home and the vehicle searched. Id. at 1675. Collins, however, concerned the automobile exception to the warrant requirement—not the plain-view exception. Furthermore, the warden here did not move or uncover anything to see defendant's truck. Therefore, we find defendant's reliance on Collins misplaced.

¶ 23.    For the foregoing reasons, we conclude that the plain-view exception to the prohibition on warrantless searches and seizures applies. Accordingly, the trial court correctly denied defendant's motion to suppress.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 24.    **REIBER, C.J., dissenting.**  The majority holds that defendant's truck was in the plain view of the game wardens from a lawful vantage point, and therefore their observations were not an unconstitutional search within the meaning of the Fourth Amendment to the United States

Constitution and Article 11 of the Vermont Constitution.[2] I disagree. In my view, the majority's analysis undervalues "the deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected." State v. Blow, 157 Vt. 513, 518, 602 A.2d 552, 555 (1991). In addition, the majority has misapplied the plain-view doctrine and the knock-and-talk exception, resulting in a bright-line rule that permits law enforcement officers to freely wander and observe while on a person's driveway, without reference to the particular circumstances of the search. Based on the facts of this case and our principles of search-and-seizure jurisprudence, I would reverse the decision of the trial court and grant defendant's motion to suppress. Accordingly, I respectfully dissent.

¶ 25. Our fundamental inquiry is whether the game wardens invaded defendant's reasonable expectation of privacy when looking through his garage-door window to view his truck. See State v. Byrne, 149 Vt. 224, 226-27, 542 A.2d 276, 278 (1988) ("[T]he touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy." (quotations omitted)); State v. Ford, 2010 VT 39, ¶ 10, 188 Vt. 17, 998 A.2d 684 (explaining Article 11 "protects the people's right to be free from unreasonable government intrusions into legitimate expectations of privacy" (quotation omitted)). Whether a law enforcement officer's actions are constitutional must be evaluated according the particular facts of that case. Ohio v. Robinette, 519 U.S. 33, 39 (1996) (holding that "touchstone of the Fourth Amendment is reasonableness" and "emphasizing the fact-specific nature of the reasonableness inquiry" (quotation omitted)); see also State v. Bauder, 2007 VT 16, ¶ 12, 181 Vt. 392, 924 A.2d 38 (rejecting "bright-line tests" in determining reasonableness in search-and-seizure jurisprudence "because these tests fail to do justice to the values underlying Article 11" (quotation omitted)).

---

[2] Because I conclude that this search violates the requirements of both Article 11 and the Fourth Amendment, I need not address any possible differences in analysis under the respective provisions.

9

¶ 26. We have long held that the reasonable expectation of privacy—and thus a person's protection against warrantless governmental intrusion—is at its highest in the home and its curtilage. Ford, 2010 VT 39, ¶ 10 (reasoning that "[t]he home is a repository of heightened privacy expectations, and as such, it receives heightened protection under Article 11," and recognizing same protection for curtilage as for home (quotation omitted)); Byrne, 149 Vt. at 227, 542 A.2d at 278 (affirming heightened privacy expectation for home and curtilage under Fourth Amendment); see also State v. Bryant, 2008 VT 39, ¶ 27, 183 Vt. 355, 950 A.2d 467 (recognizing that "Vermonters normally have high expectations of privacy in and around their homes"). As the United States Supreme Court has stated, "At the [Fourth] Amendment's very core stands the right of a [person] to retreat into [the] home and there be free from unreasonable governmental intrusion." Florida v. Jardines, 569 U.S. 1, 6 (2013). Because "[t]his right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with immunity," or could "enter a [person's] property to observe [the person's] repose from just outside the front window," the home's constitutional protections extend to the area "immediately surrounding and associated with the home." Id. (quotation omitted).

¶ 27. Both the garage, the area the game wardens observed, and the driveway, the area from which the wardens made their observation, are part of the curtilage of defendant's home. See State v. Hall, 168 Vt. 327, 330, 719 A.2d 435, 437 (1998) (listing factors courts consider in determining whether area is part of curtilage); see also ante, ¶¶ 14, 18 (holding that garage was part of curtilage and assuming driveway was part of curtilage). Because the garage and driveway are part of defendant's curtilage, we begin with the presumption that the wardens' warrantless intrusion on defendant's property and the resulting observations were unconstitutional. Bauder, 2007 VT 16, ¶ 14 ("Searches outside the normal judicial process are . . . presumptively unconstitutional . . . ."); see also Jardines, 569 U.S. at 7 (describing curtilage as "constitutionally protected area" and explaining that law enforcement officer's intrusion within curtilage is "sharply circumscribed").

10

¶ 28. This presumed protection is not absolute, however, and warrantless searches may be permissible if an exception to the constitutional protection applies. Bauder, 2007 VT 16, ¶ 14 (stating warrantless searches "are . . . permissible only pursuant only to a few narrowly drawn and well-delineated exceptions"). It is the State's burden to show such an exception applies. Ford, 2010 VT 39, ¶ 12. In this case, the State argues that the "plain-view" exception applies, and the majority agrees. See ante, ¶ 16. Under the plain-view exception, "constitutional protections do not attach to activities or possessions that a person knowingly exposes to the public." State v. Rogers, 161 Vt. 236, 244, 638 A.2d 569, 573-74 (1993) (quotation omitted); see also State v. Kirchoff, 156 Vt. 1, 7, 587 A.2d 988, 993 (1991) ("[A] person cannot rely on Article 11 to protect areas or activities that have been willingly exposed to the public. Article 11 protects the people from governmental intrusion into their private affairs; to the extent their affairs are willingly made public, the provision has no application.").

¶ 29. As the majority explains, the plain-view exception depends on an object's being in plain view from a lawful vantage point. Bauder, 2007 VT 16, ¶ 30; see also ante, ¶ 17. "[T]he place of observation is normally more important than the place observed." Rogers, 161 Vt. at 243, 638 A.2d at 573. There would be no reasonable expectation of privacy in an object located within the home but plainly visible from a public street. See, e.g., Claverie v. L.S.U. Med. Ctr. in New Orleans, 553 So. 2d 482, 486 (La. Ct. App. 1989) (reasoning "observation of plaintiff's residence from a public street [did not] constitute[] either a search or an invasion of privacy"). Nor would we recognize a reasonable expectation of privacy in an object located within the curtilage but plainly visible from a portion of private property outside of the curtilage, unless the defendant has taken steps to shield that area from the public. See Rogers, 161 Vt. at 248-49, 638 A.2d at 576 (holding state trooper's observation of defendants' garden from nearby woods—which was observation of area inside curtilage from point outside curtilage—was constitutional because "defendants [had] taken no steps to prevent the public from reaching the place of observation or

11

to prevent the observation," and therefore "they [had] knowingly exposed the garden to the public").

¶ 30.    Where, as here, law enforcement officers make observations from within the curtilage itself, the observations cannot be considered in plain view unless the officers have lawfully intruded into the defendant's curtilage to the point of observation.  See Jardines, 569 U.S. at 7 ("While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." (quotation omitted)).  Without naming it, the majority relies on the "knock-and-talk" exception to establish that the wardens lawfully entered defendant's property prior to viewing the truck.  See ante, ¶ 18.  Under this exception, "police officers are entitled to enter residential property, including portions that would be considered part of the curtilage, to carry out legitimate police business," such as to "approach[] a residence to knock on the door, or otherwise approach[] the residence to speak to the inhabitants."  State v. Koenig, 2016 VT 65, ¶ 16, 202 Vt. 243, 148 A.3d 977 (explaining "knock-and-talk" is "also an exception to the protections against warrantless searches" and is distinct from plain-view exception).

¶ 31.    The plain-view and knock-and-talk exceptions may work together to allow law enforcement officers to enter private property "to conduct an investigation or for some other legitimate purpose," and then, once there, officers' "observations made from such vantage points are not covered by the Fourth Amendment" or Article 11.  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f), at 782, 784-87 (5th ed. 2012); see also Koenig, 2016 VT 65, ¶¶ 16, 22 (quoting LaFave, Search and Seizure § 2.3(f), at 782-87 and applying same reasoning to searches under Article 11).  When officers enter private property in this way, they must "restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches)."  LaFave, Search and Seizure § 2.3(f), at 782-84; Koenig, 2016 VT 65, ¶ 17 ("In carrying out their duties during a knock-and-talk, the police are limited to the areas where the

public would be expected to go."). "[I]f police utilize normal means of access to and egress from the house for some legitimate purpose, such as to make inquiries of the occupant, . . . it is not a Fourth Amendment search for the police to see . . . from that vantage point what is happening inside the dwelling." LaFave, Search and Seizure § 2.3(c), at 752-55 (quotation omitted). "On the other hand, if the police stray from that path to other parts of the curtilage in order to conduct the surveillance," in that circumstance a visual observation "is a search within the meaning of the Fourth Amendment." Id. § 2.3(c), at 756-57. In sum, the knock-and-talk exception allows law enforcement officers to enter a person's curtilage in the same manner as a "reasonably respectful" member of the public; and the public-view exception allows officers to "keep their eyes open" while they do so. See State v. Seagull, 632 P.2d 44, 47 (Wash. 1981) (en banc) (holding that "[a]n officer is permitted the same license to intrude as a reasonably respectful citizen" and "[i]n doing so they are free to keep their eyes open").

¶ 32. Contrary to the majority's representation, this Court has never held that the knock-and-talk exception categorically allows a law enforcement officer to enter a person's driveway for legitimate police business. See ante, ¶ 18. Our case law has never established a "semiprivate" area that is categorically exempt from the reasonable expectation of privacy. Rather, we have offered a driveway as an example of a part of the curtilage that the public could be expected to go, as part of the usual way to access the home, and therefore could be considered held open to the public. For example, in State v. Pike, this Court concluded that the state trooper's observations, which were made from the driveway, were permissible because the driveway was "that portion of the curtilage which is the normal route of access for anyone visiting the premises" and so was "only a semiprivate area." 143 Vt. 283, 287, 465 A.2d 1348, 1351 (1983) (quotation omitted). We further reasoned, "[W]hen state officials come onto private property to conduct an investigation and restrict their movements to driveways which visitors could be expected to use, observations made from such vantage points are not covered by the Fourth Amendment." Id. at 288, 465 A.2d at 1351. Our inquiry in Pike was whether the officer accessed the defendant's

13

property in the same way as the public could be expected to do in approaching the property's residents—not a categorical review of whether the officer stayed on the driveway, regardless of the other circumstances of the case. See United States v. Magana, 512 F.2d 1169, 1171 (9th Cir. 1975) ("It would be equally unwise to hold, as a matter of law, that all driveways are protected by the Fourth Amendment from all penetrations by police officers as to hold that no driveway is ever protected from police incursions.").

¶ 33. We followed this reasoning in later cases, as well. In State v. Ryea, we held that observations made on defendant's driveway were constitutional because "[a] driveway serves as the normal access route for anyone visiting the premises," so although the "driveway may fall within the curtilage, it nevertheless constitutes a semiprivate area." 153 Vt. at 453, 571 A.2d at 675. Similarly, in State v. Byrne, we held that evidence found around the steps leading to the defendant's residence was constitutionally obtained because the steps were within "that portion of the curtilage which is the normal route of access for anyone visiting the premises." 149 Vt. at 228, 542 A.2d at 279 (quotation omitted). More recently, in State v. Koenig, we held that a state trooper's warrantless entry into a three-walled structure attached to the residence, which the trooper entered after identifying the suspect car from a public street, was "permissible because it was reasonable under these facts for the officer to conclude the doorway inside the structure was an entrance for the public to use to access the home." 2016 VT 65, ¶ 22. In each case, we have emphasized that the officer's observations were constitutional because, based on the facts in those cases, the observations were made within a portion of the curtilage that the public would access in visiting the home. Therefore, that portion of the curtilage could be considered publicly exposed and without a reasonable expectation of privacy.

¶ 34. Other courts have also focused on the public's access to the house in deciding whether a law enforcement officer's incursion violated a reasonable expectation of privacy. The Arizona Court of Appeals concluded in State v. Blakely that the officer's actions in that case were unconstitutional because he had "walked past the pathway that led directly to the front door and

14

continued walking down the driveway into an area ordinarily not used by visitors" rather than "approaching the front door to make contact with any occupants of the residence." 243 P.3d 628, 633 (Ariz. Ct. App. 2010). In State v. Maxfield, the Washington Supreme Court held that an investigator's observations were constitutional where the investigator, upon entering the defendant's property, went to the front door and knocked, then, when he received no answer, walked to the garage door and knocked, and the observations were made while proceeding along those walkways. 886 P.2d 123, 133 (Wash. 1994) (en banc). The court reasoned the officer "did not substantially and unreasonably depart from the area impliedly open to the public." Id. at 133; see also People v. Freeman, 460 N.E.2d 125, 131 (Ill. App. Ct. 1984) (holding police officer's observation of garage's interior through window unconstitutional because "[t]he evidence does not show the officer had to pass by the garage in order to lawfully execute the search warrant for the house, or for any other reason"). But see, e.g., People v. Crapo, 479 N.Y.S.2d 779, 780 (N.Y. App. Div. 1984) (holding "officer's action in walking up defendant's driveway to the door of his garage and then looking through the garage door window was no more intrusive an event than ordinarily occurs during the daily incidents of life in an urban neighborhood"); State v. Buzzard, 2007-Ohio-373, 860 N.E.2d 1006, at ¶¶ 1, 15 (holding officers' action in "looking through a small opening in a locked double door of a residential garage" was constitutional because "the police are free to observe whatever may be seen from a place where they are entitled to be").

¶ 35. Following a related line of reasoning, some courts have held law enforcement officers' actions unconstitutional even when the officers adhered to the public's usual route of access if the officers nonetheless exceeded their "implicit license" to enter the property. Jardines, 569 U.S. at 8. In Florida v. Jardines, the United States Supreme Court held that a law enforcement officer's purpose in entering a defendant's property is relevant to whether the officer exceeded the "implicit license" that permits the public to enter a person's curtilage "to approach the home by the front path." Id. at 8-9. The Court reasoned: "To find a visitor knocking on the door is routine," but "to spot that same visitor exploring the front path with a metal detector, or marching his

15

bloodhound into the garden before saying hello or asking permission, would inspire most of us to . . . call the police." Id. at 9. Explaining that "the background social norms that invite a visitor to the front door do not invite [the visitor] there to conduct a search," the Court concluded that in that case, where the officers had walked a drug-sniffing dog along the pathway to the front door, the officers' purpose was to "conduct a search, which is not what anyone would think [the officers] had license to do." Id. at 9-10. Similarly, in State v. Johnson, the Washington Court of Appeals held that law enforcement officers' observations were unconstitutional where the officers "never attempted to approach the house or contact the occupants," even though the officers physically remained within the public's normal access route to the home. 879 P.2d 984, 991 (Wash. Ct. App. 1994). And in Griffin v. State, the Arkansas Supreme Court adopted the same view, holding the officers' actions in that case—in which they "checked out a shed and walked around the premises" prior to obtaining consent from the occupants—did not comply with the implied consent of a "knock and talk" and were unconstitutional. 67 S.W.3d 582, 589-90 (Ark. 2002). These cases, like the cases that focus on the public's access route to the house, emphasize that a law enforcement officer may enter a defendant's curtilage only in the same manner as a member of the public. Furthermore, although an officer may see what is plainly visible when doing so, the officer has no license to conduct a warrantless search within the curtilage even in an area that is impliedly held open to the public.

¶ 36. Here the trial court found that the game wardens "went to Defendant's residence and approached the residence via the driveway," and "[a]t one point, both wardens looked into Defendant's two-bay detached garage that was located at the back of Defendant's driveway some distance from the road . . . [t]hrough a window in the garage door" and "observed Defendant's black pickup truck parked in the garage." The court made no findings about how large the window was, how close to the window the wardens stood when viewing the truck, whether the wardens

16

looked through the window before or after approaching the residence, or at what point the wardens attempted to contact the residence's occupants.[3]

¶ 37. The findings do not establish that the truck was in plain view from a public vantage point. On the contrary, the findings establish that the truck was not in plain view from the public street or from a portion of defendant's property outside of the curtilage. In order to bring the truck into view, the wardens had to enter defendant's driveway, which was part of the curtilage and "a constitutionally protected area." Jardines, 569 U.S. at 7. Because the place of observation was within the curtilage, the truck could not be considered publicly exposed unless the State showed, and the trial court found, that the wardens came to the point of observation and made the observation in the same manner as a "reasonably respectful" member of the public. See Seagull, 632 P.2d at 47; see also Jardines, 569 U.S. at 8-9 (considering whether officers' entry adhered to implied license permitting visitors to approach home). The findings do not establish this. They are silent on how the wardens came to be looking in the garage-door window or whether that spot was part of the public's access route to the house. It does not suffice that the wardens' point of observation was on the driveway. The driveway is not categorically exempted from protection against governmental intrusion. The State must show more, and the court's findings do not establish that it did so.

¶ 38. Nor does the evidence indicate that the game wardens came to the point of observation as a member of the public would when accessing the home. The photograph of defendant's property submitted at the motion-to-suppress hearing shows that his driveway proceeds onto his property a short way and then opens to the left into a small parking area. Immediately behind the parking area is the two-door garage, which is detached from the residence. To the right of the driveway is a walkway that proceeds to the house. The photograph suggests

---

[3] The court observed that defendant's wife "testified that the wardens were walking around and looking through the window of the garage" for "approximately 15 minutes before she went outside to speak to" them. However, the court did not adopt or reject this testimony in a finding.

that if the wardens parked in the driveway, or anywhere in the parking area other than directly in front of the garage-door window, they would have had to walk away from the normal access route to the house in order to get close to the garage-door window. Additionally, the photograph and a game warden's testimony at the hearing indicates that the window was not large—around eight to twelve inches. Given that size, the wardens likely would not have been able to look through the window and view the truck while walking from their parked vehicles to the front door. They would have had to walk directly to the garage-door window and stand right in front of it. Furthermore, defendant's wife's testimony indicates they did just that. As the court recounted, defendant's wife "testified that the wardens were walking around and looking through the window of the garage" for "approximately fifteen minutes before she went outside to speak with the warden." The game warden's testimony did not contradict wife's; the warden testified that they "had looked through the window pretty soon after arriving," and he could not remember whether they looked through the window first or went to the front door first. The game warden also testified that they went to defendant's property in order to find the truck, not to contact defendant, and when they did not see the truck upon arriving at defendant's property, they "went to—up to the window of one of the garage bays so [they] could look in."

¶ 39. According to this evidence, the game wardens went to defendant's property for the purpose of conducting a search for the truck, and before contacting anyone at the property, they walked away from the home, directly to the small window in the garage door, which was located far back from the public road, and peered in from a vantage point necessarily close to the window. This the wardens were not permitted to do. The fact that the driveway itself is visible from the street, or that the public may enter part of the curtilage on the way to the home, does not give law enforcement officers permission to wander freely around the driveway and investigate. This is not a situation in which observation was unavoidable from a lawful vantage point; they would not have had to "turn [their] head[s] from observing" the garage's interior "even though standing in a

18

position from which [they] could lawfully make an observation." Rogers, 161 Vt. at 248, 638 A.2d at 576. Their observations were an unconstitutional search.

¶ 40. The majority notes that defendant did not create a reasonable expectation of privacy in his garage. See ante, ¶ 21. A defendant must take affirmative steps to demonstrate a reasonable expectation of privacy in an area outside of the curtilage. See State v. Dupuis, 2018 VT 86, ¶ 11, __ Vt. __, 197 A.3d 343 ("[T]his Court has reaffirmed that a landowner must signal an intent to exclude the public from 'open fields' in order to maintain a constitutionally cognizable expectation of privacy."). An area inside the curtilage is presumed to have a reasonable expectation of privacy unless the defendant has willingly exposed the area to the public. See Rogers, 161 Vt. at 244, 638 A.2d at 573-74. The interior of the garage was not exposed to the public. The garage's interior was not plainly observable from the public street or from an area outside of the curtilage. It also was not plainly observable to a member of the public accessing the house. The garage's interior therefore retained its presumed reasonable expectation of privacy.

¶ 41. Furthermore, the fact that the driveway itself was plainly exposed to public view does not put everything that can be seen from the driveway within public view. As the Eighth Circuit said in United States v. Wells, "[A] homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas." 648 F.3d 671, 678 (8th Cir. 2011). In that case, the court reasoned that the defendant "certainly exposed his unpaved driveway to public view, and therefore could not reasonably expect that members of the public would not observe whatever he might do there." Id. However, the defendant "could reasonably expect that members of the public would not traipse down the drive to the back corner of his home, from where they could freely observe his entire backyard." Id. In the same way here, although defendant's driveway was publicly exposed, and therefore he had no reasonable expectation of privacy in what he did on the driveway, he could reasonably expect that the public would not wander around his driveway, in the opposite direction from his house, position themselves close to his garage-door window, and peer in.

19

¶ 42.    Based on the reasoning above, I would hold that the trial court erred in denying defendant's motion to suppress.  I therefore respectfully dissent.

¶ 43.    I am authorized to state that Justice Robinson joins this dissent.

 

 

_____

Chief Justice