NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 76

No. 2020-079

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Devan Calabrese | February Term, 2021 |

John R. Treadwell, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Allison N. Fulcher of Martin, Delaney & Ricci Law Group, Barre, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.     **ROBINSON, J.**  Defendant appeals his convictions for aggravated assault with a deadly weapon, unlawful possession of a firearm, and violation of conditions of release, arguing that the court committed reversible error in denying his motion to suppress and permitting the State to introduce evidence that he made certain racially charged statements. We conclude that the trial court erred in concluding that the trooper's search did not violate Article 11 and the trial court's denial of the motion to suppress was thus error. With respect to the evidence that defendant made statements evincing racial animus, we do not specifically rule on defendant's challenge, but set forth the principles that should guide the trial court if the issue arises on remand. We thus reverse and remand.

¶ 2.    The State charged defendant in September 2019 with aggravated assault with a deadly weapon, reckless endangerment, unlawful possession of a firearm, and violation of conditions of release, in connection with an altercation in which he was alleged to have threatened another person with a handgun.  The State's witness, Trooper Waitekus, testified in the suppression hearing that on August 29, 2019, three individuals came to the police station and gave sworn statements that during a conversation at defendant's girlfriend's home, defendant "pulled [a gun] on them and they were basically ordered off the property at gunpoint."  One of the witnesses also reported that he saw and heard a bullet eject out of the side of the gun when defendant cocked it.

¶ 3.    Later that night, the Trooper Waitekus spoke with defendant's girlfriend at her home where the incident was reported to have taken place.  The trooper also requested to look around the property and did so.  On cross-examination, he testified that he "d[id] not remember how thoroughly [the officers] checked the lawn for [the bullet]," and that their focus was on looking for defendant.  The trooper then went to defendant's address, which his girlfriend provided, but did not find defendant there.  The next day, the trooper spoke with defendant's friend who was also present during the altercation.  Defendant, defendant's girlfriend, and defendant's friend each gave sworn statements that there was no weapon drawn during the altercation.

¶ 4.    Two days later, Trooper Waitekus was dispatched to the girlfriend's home for a welfare check.  Trooper Waitekus testified that he contacted the girlfriend's father, who was his electrician, in an attempt to locate the girlfriend, and the father offered to meet him at the girlfriend's house to check on her.  The trooper stated, he "was alone at the time," and thought it was "probably good to bring a second person in this situation."  The two met in the girlfriend's driveway after dark.  The trooper knocked on the door, and when there was no response, he walked through an unlocked door.  He testified that he proceeded to look for other people in the house, "breezed over the kitchen table to see if there w[ere] any notes" from the girlfriend indicating she was in trouble, and left after he "saw nothing . . . out of the ordinary."

2

¶ 5. Trooper Waitekus and the girlfriend's father left through the garage door. The trooper testified, "As I walked down the driveway, I—my brain told me that specifically, this other incident took place at a specific location in the driveway and as I walked down the driveway, I looked down where it should have been and observed something . . . . [O]ne bullet."[1] He also testified, "it was in my head to keep my eyes open [for the bullet]." According to the trooper, he was standing "on the edge of the driveway about . . . halfway between the house and the road" when he saw the bullet. When the defense asked whether he was shining a flashlight on the side of the lawn next to the driveway to look for the bullet, the trooper stated, "I would say that'd be highly possible, yes." He further testified, "I stopped—yes. At the specific spot I believe the incident happened." In response to the State's question as to whether the bullet was "in plain view," the Trooper responded, "Yes." When he saw the bullet, he said to the girlfriend's father, "oh, my God . . . don't move," and went to get his camera from his car. At the hearing on defendant's motion to suppress, the trooper conceded that in the photo he took, both ends of the bullet are partly obscured by grass.

## I. Motion to Suppress

¶ 6. Prior to trial, defendant moved to suppress the 9mm bullet recovered from defendant's girlfriend's yard, which the State sought to introduce as evidence. Specifically, defendant argued that the exclusionary rule applied because the trooper violated defendant's rights under Article 11 in conducting a warrantless search for the bullet on the girlfriend's property.

¶ 7. The trial court denied the motion. Citing a recent decision of this Court in State v. Bovat, 2019 VT 81, 211 Vt. 301, 224 A.3d 103, the trial court concluded that the trooper did not conduct a search at all because the driveway—as a "normal access route for anyone visiting"— was, at most, a semiprivate location. If state officials limit their movement to semiprivate areas to

---

[1] Trooper Waitekus clarified in his testimony that what he found is a cartridge, which is a bullet that hasn't been fired yet.

conduct their investigation, the court concluded, observations made from those points are not covered under the Fourth Amendment. The court thus concluded that the trooper was lawfully present in defendant's girlfriend's driveway when he observed the bullet and that there had been no steps taken to indicate that strangers were not welcome on the driveway.

¶ 8. On appeal from his conviction following a jury trial, defendant contends the trial court erred in denying his motion to suppress. As a threshold matter, we reject the State's argument that defendant lacks standing. On the merits, we conclude that the record does not support the conclusion as a matter of law that the trooper conducted an unlawful search and that the court erred in denying defendant's motion to suppress.

### A. Standing

¶ 9. The State argues that defendant lacks standing to argue that the trooper's recovery of the bullet from the ground next to defendant's girlfriend's driveway violated Article 11.[2]

¶ 10. Article 11 of the Vermont Constitution provides specifically that "the people have a right to hold themselves, their houses, papers, and possessions free from search or seizure." Whether defendant has standing to challenge the trooper's search is a question of law that we review without deference to the trial court. Baird v. City of Burlington, 2016 VT 6, ¶ 11, 201 Vt. 112, 136 A.3d 223.

¶ 11. Consistent with our Article 11 case law more generally, this Court has established a test for standing to assert an Article 11 violation that is more expansive than the federal test for standing to challenge a violation of the Fourth Amendment. In determining the contours of that test, we consider our own case law and also look for guidance to decisions from our sister state

---

[2] Defendant's claim that the State did not raise this argument to the trial court is wrong as a matter of fact and law. The State raised its concern regarding standing after defendant filed the motion to suppress, and the court recognized there was "an interesting standing issue"; moreover, the State may argue for affirmance on any basis, and the Court may affirm on any basis. See In re J.L., 2007 VT 32, ¶ 6, 181 Vt. 615, 928 A.2d 474 ("[W]e may affirm a decision of a trial court on any legal basis supported by the record, even if it was not the theory relied on by the trial court.")

that applies a similar standing test. Applying our test, we conclude that defendant here has a "participatory" interest in the bullet used as evidence against him in his trial for the crime for which he is charged, and thus has standing to assert an Article 11 violation.

¶ 12. Vermont parts ways from the federal test for standing to challenge a government search. The federal test requires that an individual have a "legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). This Court has declined to adopt the federal test on the ground that it is incompatible with the plain meaning and historic purpose of Article 11. State v. Wood, 148 Vt. 479, 482, 536 A.2d 902, 904 (1987). In Wood, we emphasized that Article 11 plays a crucial role in giving authority to the judiciary to protect the people from unlawful searches and seizures, "which are the means historically relied upon by a government seeking to impose its will upon a reluctant people," and we recognized that the courts apply this legal check every time they scrutinize a search in ruling on a motion to suppress. Id. at 488-89, 536 A.2d at 908. We observed that the federal test as redefined in Rakas, "curtails th[e] function of the judiciary by focusing on the defendant's ability to present a challenge rather than on the challenge itself, and by unduly limiting the class of defendants who may invoke the right to be free from unlawful searches and seizures." Id. at 489, 536 A.2d at 907-08; see also id. at 489 n.7, 536 A.2d at 908 n.7 (noting that federal test does not promote restraint of officer discretion in the field through use of search warrants).

¶ 13. We concluded that Article 11 "premises the protected right upon an objectively defined relationship between a person and the item seized or place searched, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy in the area searched." Id. at 489, 536 A.2d at 908. To establish standing under Article 11, "a defendant need only assert a possessory, proprietary or participatory interest in the item seized or the area searched." Id. (emphasis added). This test, we have noted, is easier to apply and provides law enforcement with more useful guidance because it is based on an objective inquiry into the relationship between a

5

suspect and the place searched or the item to be seized rather than an analysis of the suspect's expectation of privacy. Id. at 490, 536 A.2d at 908-09. If a protected interest exists, the reviewing court then looks to the substantive challenge. Id. at 490, 536 A.2d at 908.

¶ 14. We have applied this standard in only a handful of cases. In State v. Welch, we analyzed a defendant's claim of "participatory interest." 160 Vt. 70, 624 A.2d 1105 (1992). The defendant argued that officers violated her rights under both the federal and the Vermont constitutions when an investigating trooper inspected her pharmacy records without a warrant. In analyzing the defendant's standing to challenge the search under Article 11, this Court considered whether defendant had a "possessory, proprietary, or participatory interest" in the place searched or the items seized. Id. at 77, 624 A.2d at 1109. We concluded that the defendant could not establish a possessory or proprietary interest in the pharmacies or their records and recognized that we had not defined "participatory interest" in our cases. Id. In defining a "participatory interest," we considered the Black's Law Dictionary definition of "participate"—" '[t]o receive or have a part or share of; to partake of; experience in common with others.' " Id. (quoting Black's Law Dictionary 1118 (6th ed. 1990)). We also quoted the Supreme Court of New Jersey's definition of "participatory": to " 'connote some involvement in the underlying criminal conduct' that generated the seized evidence." Id. (quoting State v. Mollica, 554 A.2d 1315, 1321 (N.J. 1989)). We held that the defendant had standing to challenge seizure of her pharmaceutical records where "it was defendant whose illicit actions gave rise to the pharmaceutical records." Id. at 78, 624 A.2d at 1109.

¶ 15. The Mollica case, on which we relied in Welch, is instructive. There, applying the same test as we use in Vermont, the court concluded that a defendant whose gambling activities generated telephone calls had standing to challenge the seizure of hotel records documenting calls made from a co-defendant's hotel room. Mollica, 554 A.2d at 1320-21. The court recognized that an individual must have some connection or relationship with seized evidence in order to challenge

6

the constitutionality of the seizure. Id. As in Vermont, courts in New Jersey recognized that individuals with a "proprietary, possessory, or participatory interest in either the place searched or the property seized" have standing to raise state constitutional challenges to searches and seizures. Id. at 1320. In defining "participatory interest," the court said:

> A participatory interest in seized evidence extends beyond the kind of relationship that could otherwise be considered only proprietary or possessory. It rather stresses the relationship of the evidence to the underlying criminal activity and defendant's own criminal role in the generation and use of such evidence.

Id. at 1320-21. It further explained that, "[u]nlike the terms 'possessory' or 'proprietary,' which denote property concepts, 'participatory' connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity." Id. at 1321. Because the defendant was alleged to have participated in the underlying criminal conduct that involved the use of his co-defendant's hotel room telephone and generated the call records, and because law enforcement officers subsequently secured a warrant to search the defendant's room based in part on those records, the court concluded that defendant had a sufficient relationship to the records to establish a participatory interest. Id. In sum, the court said, the defendant's involvement in the criminal conduct which generated the evidence accorded the defendant standing to challenge the seizure of that evidence. Id.

¶ 16. We recognize that the New Jersey Supreme Court has subsequently established some limitations on the scope of a cognizable participatory interest, including considerations of time and place. In State v. Bruns, the court said:

> If substantial time passes between the crime and the seizure of the evidence, and a proprietary connection between defendant and the evidence no longer exists, the defendant's basis for being aggrieved by the search will have diminished. In addition to the temporal aspects of a specific search or seizure, a showing that the search was not directed at the defendant or at someone who is connected to the crime for which he has been charged also will diminish a defendant's interest in the property searched or seized.

7

796 A.2d 226, 237 (N.J. 2002). In that case, police seized evidence from an individual's car following a stop for speeding. Three months later, the arresting officer discovered that the police department was conducting an investigation of an armed robbery that had occurred seven days prior to the stop, involving the driver and the defendant. At trial for armed robbery, the defendant sought to exclude the evidence introduced against him that had been seized in the stop, arguing that the stop was unlawful. In determining whether the defendant had standing to bring this challenge, the court pointed to the analysis in Mollica, which "emphasized the relationship between the evidence seized and the underlying criminal activity with which defendant was charged, as well as the extent to which a co-defendant played a role in generating and using that evidence." Id. at 236. It concluded that the relationship between the weapons seized and the crime with which the defendant was charged was not adequate to confer standing based on a participatory interest. Id. And, it noted that there must be "some contemporary connection between the defendant and the place searched or the items seized." Id. at 237. The weapons seized in that case were not related to any ongoing activity between the defendant and the target of the search at the time of the search, and the robbery the defendant was charged with occurred seven days before the search. Id. Based on the passage of time between the alleged crime and the seizure, the fact that defendant was not physically close to the evidence when it was seized in the vehicle stop, and the absence of any connection between the defendant and the events leading to the initial stop or arrest that resulted in the search, the court concluded that the defendant did not have standing. Id. at 237.

¶ 17. We need not decide here whether to adopt any similar limitations because we conclude that even if we did, defendant here would still have participatory standing. Unlike in Bruns, the law enforcement officer here was aware that defendant was alleged to have engaged in criminal conduct at the girlfriend's home, which might have produced the evidence the trooper looked for and found following his welfare check. The trooper found the bullet only two days after the alleged crime while he was still actively investigating it. Although defendant was not

8

involved in the events leading to the welfare check that brought him to the property, Trooper Waitekus testified that he had in mind when he went to conduct the welfare check that it would be a good opportunity to look for the bullet from the alleged crime. In this case, as in Welch and Mollica, defendant's involvement in the underlying criminal conduct of threatening the witnesses with a handgun is what gave rise to the ejected bullet that was seized from his girlfriend's driveway, which is where the conduct was alleged to have taken place. We conclude that this qualifies as a participatory interest with respect to the item seized, and that defendant has standing to challenge the constitutionality of the underlying search under Article 11.

## B. Merits

¶ 18. With respect to the merits, defendant argues that the trooper's search next to defendant's girlfriend's driveway was unlawful under Florida v. Jardines, 569 U.S. 1 (2013). In particular, he argues that this Court's recent decision in Bovat, 2019 VT 81, which the trial court relied on in denying his motion to suppress, is inconsistent with Jardines, and that the trooper exceeded the limited scope of his license to enter the property. The State maintains that the trooper here observed the bullet in plain view from a place he had a legal right to be.

¶ 19. The denial of a motion to suppress involves a mixed question of fact and law. We accept the trial court's findings of fact unless they are clearly erroneous, but we review the question of whether the facts meet the proper legal standard without deference to the trial court. State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280. We conclude that the trial court's denial of the motion to suppress on the basis that the trooper's observations from the vantage point of the driveway were not subject to the protections of the Fourth Amendment was based on an incorrect understanding of the law. In reaching this conclusion, we consider the United States Supreme Court's guidance concerning the relationship between two well-established exceptions to the warrant requirement—the "plain view" doctrine, and the limited license police may exercise in many cases to approach and retreat from the front door of a home. See Jardines, 569 U.S. at 6. To

9

the extent that our analysis is inconsistent with any of our discussion in Bovat, we overrule that decision. See 2019 VT 81. Applying the above legal principles to the record, viewed in the light most favorable to defendant, we conclude that in actively looking for the incriminating evidence while stopped in defendant's girlfriend's driveway, the trooper exceeded his limited license to enter the girlfriend's property. We accordingly reverse and remand.

¶ 20. Under Article 11, as under the Fourth Amendment, warrantless searches of private property are "presumptively unconstitutional, and permissible only to a few narrowly drawn and well-delineated exceptions." State v. Bauder, 2007 VT 16, ¶ 14, 181 Vt. 392, 924 A.2d 38. The United States Supreme Court has recognized that "when it comes to the Fourth Amendment, the home is first among equals." Jardines, 569 U.S. at 6. The right to retreat into one's home and there be free from unreasonable governmental intrusion stands at the "very core" of the Fourth Amendment. Id. (quotation omitted). The Fourth Amendment's particular solicitude for privacy in the home extends to the area immediately surrounding the house, or the "curtilage." Id. at 5-6; see also State v. Koenig, 2016 VT 65, ¶ 13, 202 Vt. 243, 148 A.3d 977 ("A home's curtilage—the area outside the physical confines of a house into which the privacies of life may extend—merits the same constitutional protection from unreasonable searches and seizures as the home itself." (quotations omitted)).

¶ 21. One exception to the warrant requirement recognized under both the state and federal constitution is the plain view doctrine. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." In re Search Warrant, 2012 VT 102, ¶ 35, 193 Vt. 51, 71 A.3d 1158 (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). The plain view doctrine is based on two principles: "first, 'that when a police officer has observed an object in plain view' from a legal vantage point, the owner's privacy interests are forfeited, and second, that requiring a warrant once the police 'have

obtained a first-hand perception of [the object] would be a needless inconvenience.' " Bauder, 2007 VT 16, ¶ 30 (quoting Texas v. Brown, 460 U.S. 730, 739 (1983)).

¶ 22. A second exception is that in some cases government agents may be entitled to enter private property without a warrant to conduct legitimate government business pursuant to an implied or explicit license. See Koenig, 2016 VT 65, ¶¶ 16-17. As the United States Supreme Court has explained:

> [T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, because that is no more than any private citizen might do.

Jardines, 569 U.S. at 8 (footnote omitted) (quotations omitted).

¶ 23. When these two exceptions combine, the effect of the whole is less than the sum of its parts. It is not the case that the plain view doctrine, combined with the principle authorizing entry pursuant to an implicit license, allows police to search or seize without a warrant any object that can be viewed from the portion of the curtilage of the home that officers may lawfully traverse in exercising an implicit license to approach the front door. As the United States Supreme Court has recognized, "[w]hile law enforcement officers need not 'shield their eyes' when passing by the home 'on public thoroughfares,' an officer's leave to gather information is sharply circumscribed when [the officer] steps off those thoroughfares and enters the Fourth Amendment's protected areas." Jardines, 569 U.S. at 7 (citation omitted). In the context of observations of peoples' homes and the area immediately surrounding them, the plain view doctrine applies to observations undertaken from public thoroughfares "in a physically nonintrusive manner," but does not operate

in the same way once an officer enters the private property surrounding a home without a warrant. Id. 569 U.S. at 7-8.

¶ 24.   The United States Supreme Court clarified the relationship between these two doctrines in the Jardines case, emphasizing that the applicability of the plain view doctrine in the context of a warrantless but licensed police entry into the constitutionally protected curtilage of the home is limited by the scope of that license.  Id.  The Court there considered whether there was a Fourth Amendment violation where officers brought a drug-sniffing dog to a defendant's home and allowed it to sniff around in the area immediately surrounding the home as the officer approached the house.  Id. at 3.  The Court acknowledged that police were licensed to enter the property and approach the front door in the same manner as other members of the public were implicitly invited to do, but made it clear that just because police may lawfully enter property without a warrant within the scope of such implied license does not mean the officer is free to conduct a warrantless search that would otherwise be unpermitted.  Id. at 7-8.  As the Court recognized, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."  Id. at 9.  The Court concluded that the search in that case was unlawful because the officers entered the defendant's constitutionally protected curtilage and exceeded any implied license to proceed to the front door and knock when it introduced the drug-sniffing dog to explore the area around the home "in hopes of discovering incriminating evidence." Id.

¶ 25.   The Supreme Court's analysis in Jardines is significant insofar as the Court did not simply ask whether the officers had a license to enter into the curtilage of the home where they gathered the incriminating evidence; it also asked whether that license included doing what they did when they got there.  Just as a trick-or-treater or solicitor may have an implicit license "to approach the home by the front path, knock promptly, wait briefly to be received, and then . . . leave," police officers on legitimate business may approach the home by the front path,

12

conduct their business within constitutionally permissible bounds, and leave. Id. at 8. However, absent additional evidence of an invitation or license, neither the trick-or-treaters and solicitors, nor police officers without a warrant, are invited to engage in investigative activities that fall outside the scope of the initial license to enter. Id. at 9.

¶ 26. This Court considered the interaction between the plain view doctrine and the principle allowing warrantless entry in some cases pursuant to an implied license in Bovat, but we did not cite or analyze the U.S. Supreme Court's decision in Jardines. 2019 VT 81. In Bovat, law enforcement officers were investigating a possible deer jacking. They walked up the defendant's driveway to a detached garage and observed the defendant's truck through the window of the garage door. The wardens saw what they believed to be deer hair and blood on the truck's tailgate. The officers obtained a search warrant based in part on their observations through the window. This Court concluded that the defendant's garage was within the curtilage of his home. Id. ¶ 10. However, we suggested that the defendant's driveway could be treated as a "semiprivate area" and said that "[w]hen state officials restrict their movement to semiprivate areas to conduct an investigation, 'observations made from such vantage points are not covered by the Fourth Amendment.' " Id. ¶ 18 (quoting State v. Pike, 143 Vt. 283, 288, 465 A.2d 1348, 1351 (1983)). We concluded that the wardens were conducting a "legitimate police investigation, during which they observed defendant's truck in plain view from a semiprivate area."[3] Id. ¶ 10.

¶ 27. We take this opportunity to clarify the law and overrule Bovat to the extent it misstated the law under the Fourth Amendment, or, by extension, Article 11. Pursuant to federal law, there is no portion of the curtilage that is exempt from Fourth Amendment protection. Article

---

[3] The U.S. Supreme Court subsequently issued an order denying defendant's petition for certiorari, which contained a statement signed by three members of the Court, criticizing the majority opinion in Bovat. Bovat v. Vermont, 592 U.S.__, 141 S. Ct. 22 (2020) (mem.). Specifically, the statement said, "Under Jardines, there exist no 'semiprivate areas' within the curtilage where governmental agents may roam from edge to edge." Id. at ___, 141 S. Ct. at 24.

11, which, if anything, provides stronger protections against warrantless searches and seizures, likewise applies throughout the curtilage. The trial court therefore erred by concluding that the Trooper did not conduct a search because the driveway was a "semiprivate area" not protected by the Fourth Amendment or Article 11. An officer may only intrude into a constitutionally protected area subject to an express or implied license, and the officer's observational activities within that protected area are limited by the scope of that license. See Jardines, 569 U.S. at 8-9.[4]

¶ 28. We recognize that the various demands on law enforcement personnel are complicated—investigating crimes and community caretaking are both important functions. And we acknowledge that "police officers are entitled to enter residential property, including portions that would be considered part of the curtilage, to carry out legitimate police business." Koenig, 2016 VT 65, ¶ 16. Accordingly, law enforcement officers may pass to and from the front door of a private residence without a warrant in the context of community caretaking activities pursuant to a general license to approach for legitimate law enforcement purposes,[5] absent an indication that members of the public, including law enforcement officers, are not invited to approach. Officers need not wear blinders on the way to and from the front door, and the use of evidence

---

[4] Likewise, to the extent we suggested in State v. Koenig that those parts of the curtilage that provide ingress to and egress from the home are "semiprivate" for constitutional purposes, we clarify that the curtilage of the home is fully subject to the protections against warrantless intrusions in the United States and Vermont constitutions, subject only to specific and limited exceptions. See Koenig, 2016 VT 65, ¶¶ 16-17.

[5] We need not determine the extent to which a license to enter without a warrant for community caretaking purposes based on exigent circumstances exists even in the face of gates, warnings against trespass, or other similar indication that members of the public, including law enforcement officers, are not invited to approach. Cf. Koenig, 2016 VT 65, ¶ 18 (explaining that "absent evidence of intent to exclude the public, the entryway to a person's house offers implied permission to approach and knock on the front door" (quotation omitted) (alteration omitted)); State v. Kirchoff, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991) (holding that in the context of open fields, Article 11 protects against warrantless searches where "indicia would lead a reasonable person to conclude that the area is private"). In this case, there is no evidence of any such indicia, and the State relies on the general license to approach the front door for legitimate law enforcement purposes.

encountered in the course of ingress or egress may be constitutionally permissible under the plain view doctrine. See United States v. Reyes, 283 F.3d 446, 465 (2d Cir. 2002) ("[W]hen 'police take [the route which any visitor to the residence would use] for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open.' " (quoting LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(e), at 499 (3d ed. 1996))). But any search pursuant to license must be limited by the "specific purpose" of that license. Jardines, 569 U.S. at 8-9 (emphasis added). "It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." United States v. Taylor, 624 F.3d 626, 633 (4th Cir. 2010) (quotation omitted) ; see also United States v. Johnson, 410 F.3d 137, 145 (4th Cir. 2005) ("[W]arrantless entry for emergency reasons cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." (quotation omitted) (alteration omitted)). In short, if an officer exceeds the scope of a limited license by undertaking a search within a constitutionally protected area without a warrant, evidence observed in the context of the officer's exceeding the license does not fall under the plain view exception.

¶ 29.    Our inquiry thus turns to whether the trooper's actions here exceeded the scope of the welfare check that authorized his presence in the curtilage of the home. With respect to the facts, because the trial court relied on the erroneous notion that observations made from so-called "semiprivate" areas within the curtilage that serve as a normal access route for visitors are not covered by the Fourth Amendment or Article 11, it did not make findings regarding the trooper's conduct and whether and how it fit within the scope of his limited license to enter the property. For example, it did not make a finding about whether the trooper did, in fact, shine a flashlight on the grassy lawn as he attempted to visually locate the bullet in the spot where he expected to find it. Because the trial court did not make important findings applying the proper standard, we can only affirm if the record, viewed in the light most favorable to defendant, compels the conclusion that the trooper did not engage in investigative activities that exceeded the scope of his limited

15

license to be on the property. For that reason, in assessing the evidence, we view it in the light most favorable to the defendant.

¶ 30. Viewing the facts in this light, this is not a case in which an officer entered and exited the house for the purpose of conducting a welfare check and just happened to stumble upon the incriminating cartridge on his way back to his car. The evidence, viewed in the light most favorable to defendant, can support a conclusion that the trooper exceeded his limited license to pass through defendant's girlfriend's driveway to conduct a welfare check by actively looking for the bullet in the grass by the area of the driveway where he understood the standoff had occurred. After determining that the girlfriend was not at home, the trooper left the home and proceeded back down the driveway. Although the trooper did not wander throughout the curtilage of the home, nor did he peer through a window of a closed garage, as in <u>Bovat</u>, he testified that during his egress from the welfare check, he was looking for the bullet from the altercation two nights before where he expected it to be in the driveway. By his own testimony, he deliberately stopped walking at the spot where he believed the incident had occurred, and it was "highly possible" that he shined his flashlight onto the lawn next to the driveway where he believed he would find the bullet. These acts—proceeding to the site of the alleged crime, stopping his forward movement, directing his attention to the lawn where he expected to see the bullet, and shining his flashlight— had nothing to do with the purpose of his visit, which was to conduct a welfare check at the home.[6]

¶ 31. On this evidence, the factfinder could conclude that the trooper took a series of concrete steps to conduct a search for the bullet. Those acts provide objective confirmation of what he essentially admitted to be his subjective purpose: to conduct a search. See <u>Jardines</u>, 569

---

[6] The fact that Trooper Waitekus used a flashlight to illuminate his path to and from the home is not particularly significant. But using a flashlight to illuminate not the path to and from the home, but the spot where he hoped to find incriminating evidence is a different matter because <u>that</u> conduct goes beyond what one would expect from a visitor approaching or leaving the home at night.

U.S. at 10 (concluding that the officers' behavior "objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do").  On this understanding of the evidence, the question is not whether the trooper had an objectively reasonable basis for conducting a welfare check, or even whether his conduct in performing the welfare check was reasonable; it is whether his active visual search for the bullet in the grass by the scene of the alleged crime was intrinsic to the welfare check that gave him limited constitutional authority to be present in the curtilage of the home in the first place.  Because it was not, on this view of the evidence, the trooper's warrantless search violated defendant's rights under the Fourth Amendment and Article 11.  The intrusion might not seem shocking in this case, but allowing the State to dispense with the warrant requirement and conduct otherwise unlawful searches in the course of "knock-and-talk" visits to the front door, or entries for the purpose of caretaking, would erode the most "core" of rights under the Fourth Amendment and Article 11.[7]  The dissent emphasizes that the trooper's license to conduct a welfare check authorized him to be in the spot where he was when he made the observation—an assertion we do not contest.[8]  But, as noted above, the lesson of Jardines is that once an officer physically enters the protected curtilage of a home, the application of the plain view doctrine is limited to observations made within the scope of the trooper's license.  What an officer is doing is just as important as where the officer is when making the challenged observation.  Affirmatively looking for the incriminating evidence from a spot where the officer is entitled to be is constitutionally different from stumbling upon it because the scope of the officer's limited license does not encompass searching for the incriminating

---

[7]  We note that the burden of securing a warrant to search for the bullet would have been minimal.  Based on the statements of multiple witnesses, the Trooper had ample evidence to establish probable cause for a warrant to enter the premises and search the area surrounding the site of the altercation without the constraints associated with his community caretaking role.

[8]  We do not address the Trooper's conduct searching through the interior of the home, including under beds and in closets, as this conduct is not relevant to the issues in this appeal.

17

evidence. This does not require an analysis of the officer's subjective intent; it is a question of the objective inferences that may be drawn from the officer's actions. Because the evidence in this case can support the conclusion that the trooper affirmatively searched for the bullet—albeit from a location he was licensed to be—we cannot affirm the trial court's ruling denying defendant's motion to suppress.

¶ 32. As noted above, the trial court did not make the necessary factual findings to inform the proper legal analysis because it applied the wrong constitutional standard, and we decline to fill the void with our own factual findings. Although the question whether the trooper's conduct "objectively reveal[ed] a purpose to conduct a search," Jardines, 569 U.S. at 10, is a question of law, determination of what the trooper did involves questions of fact to be determined by the trial court in the first instance. We accordingly remand for the trial court to make findings of fact concerning the trooper's conduct surrounding his location of the incriminating evidence.

## II. Defendant's Inflammatory Statements

¶ 33. Defendant also argues that testimony from his probation officer that defendant used the n-word in referring to the complaining witnesses following the altercation was unduly prejudicial, and the trial court ran afoul of Vermont Rule of Evidence 403 in allowing the testimony. Before trial, the State gave notice that it intended to introduce this testimony, and defendant objected; the trial court deferred its ruling. At the beginning of the trial, the court ruled that under Vermont Rule of Evidence 403, the proposed testimony was not unduly prejudicial and would be allowed. The court did not provide any analysis as to its basis for concluding that the evidence was probative with respect to the issues in the case, and not unduly prejudicial.

¶ 34. This Court may address such issues if they are likely to arise on remand. See In re H.H., 2020 VT 107, ¶ 14, __ Vt. __, 251 A.3d 560 (addressing collateral estoppel issue although not necessary to disposition of the case because it was "likely to recur on remand"). However, the admissibility of the objected-to testimony on remand will depend on the specifics of the evidence

18

as presented in a new trial. Accordingly, we do not decide whether the trial court erred in admitting the testimony in the last trial, but instead elucidate the general considerations that will come into play if the issue arises on remand.

¶ 35. The n-word is an odious and highly offensive word, evoking a continuing history of racial violence and oppression. For that reason, courts have found evidence of its use in some contexts highly probative. See, e.g., United States v. Pemberton, 435 F. Supp. 3d 250, 257 (D. Me. 2020) (concluding that evidence of police officers' racial bias and use of n-word was likely admissible to undercut credibility of their investigation); People v. Quartermain, 941 P.2d 788, 804 (Cal. 1997) ("Expressions of racial animus by a defendant towards the victim and the victim's race, like any other expression of enmity by an accused murderer towards the victim, is relevant evidence in a murder or murder conspiracy case."); State v. Lipka, 413 P.3d 993, 995-96 (Or. Ct. App. 2018) (concluding evidence defendant called police officers the n-word was probative of his state of mind and would permit an inference of his intentionality in committing the crime and his attitude toward law enforcement generally even where his racial views were not a material issue).

¶ 36. For the same reason, in some contexts such evidence can result in significant prejudice against a defendant. Zebroski v. State, 715 A.2d 75, 79 (Del. 1998) (recognizing potential prejudice because statement could be "possibly inflammatory"); Guerrero v. State, 125 So. 3d 811, 815 (Fla. Dist. Ct. App. 2013) ("Ordinarily, racial slurs and ethnic epithets are so prejudicial as to render them inadmissible, unless the probative value outweighs any prejudice that may result from having the jury hear them."); Lipka, 413 P.3d at 996 (recognizing use of n-word was "highly offensive and inflammatory"). In assessing the admissibility of this evidence, if the State seeks to introduce it in the context of a retrial and defendant objects, the trial court should consider whether and on what basis the testimony has probative value, and whether any prejudicial impact substantially outweighs that probative value. V.R.E. 403. A trial court is not required to state precisely how it weighed each factor in considering whether the probative value of evidence

19

is substantially outweighed by its prejudicial effect. <u>In re S.G.</u>, 153 Vt. 466, 473, 571 A.2d 677, 681 (1990). However, "there must be <u>some</u> indication," especially in cases where the potential for unfair prejudice is high, that the court engaged in an actual balancing test under Rule 403. <u>State v. Shippee</u>, 2003 VT 106, ¶ 14, 176 Vt. 542, 839 A.2d 566 (mem.) (concluding that trial court abused its discretion where there was no sign of its weighing of evidence under Rule 403).

<u>Reversed and remanded for a new trial consistent with this opinion</u>.

FOR THE COURT:

_____

Associate Justice

¶ 37. **EATON, J., dissenting.** Assuming for the sake of argument that defendant has standing to raise a constitutional challenge to the recovery of the ammunition cartridge, I believe the cartridge was seen in plain view by the officer when he was in a location where he was legally permitted to be. I therefore do not believe its warrantless recovery violated Article 11. I also do not believe the court erred in admitting defendant's use of "racial-animus-related language" and I would affirm defendant's convictions.

A.  Motion to Suppress

¶ 38. The facts recited by the majority are accurate, but incomplete. There are additional facts from the suppression hearing which provide further context for the officer's actions and a more complete basis upon which to objectively judge the officer's conduct against constitutional protections.

¶ 39. The welfare check on August 31 was requested by a concerned neighbor who had not seen the girlfriend in a few days and noted that "things have been going on over there." There is no evidence that the welfare check was staged by the trooper as a ruse for him to regain entry into the home. In fact, there is no evidence that he played any role in his being assigned to conduct

20

the check. Additionally, the girlfriend's father was concerned about his daughter's wellbeing because she had not "been in a great place emotionally," and he was "nervous, to say the least," about what they might find at her home; he communicated this to the officer. The trooper accepted the father's offer to meet him for the welfare check, noting that because of the family relationship, he might "be able to . . . assist me in locating her the quickest," and observing that "if something was found, it's good to have a witness with you . . . God forbid, this is a welfare check and that could lead to terrible stuff." The officer's purpose was "just a welfare check" and if he could determine the girlfriend was "all set," the "call would be over."

¶ 40. On the girlfriend's property, there was neither a fenced enclosure, no-trespassing sign, nor any other indication that the girlfriend intended to restrict visitor access to her driveway, the same place she had previously given the investigating officers, including the trooper, permission to search on the night of the incident. When the trooper and her father arrived at the home, the girlfriend's dog was barking. The trooper testified that based on a "past call and the call that we had, [he] felt it was important to enter the house and check her welfare." Accordingly, he and her father went in through the unlocked door. The trooper testified that he looked in "closets, under beds," and in "every room [he] thought a human being could fit."

¶ 41. As the trooper and the girlfriend's father left the premises, the two men stopped in the driveway, approximately midway between the house and the road, and began conversing; the girlfriend's father had asked the trooper some questions about what occurred at his daughter's home previously. The men were positioned at the edge of the driveway and within four feet of the open door of the trooper's car as they spoke, with the father's vehicle parked to the side of the officer's vehicle. The trooper testified that the location in which they had stopped was also "the specific spot" where he believed the incident they were discussing had happened.

¶ 42. The trooper explained that it was "in [his] head to keep [his] eyes open" for the bullet, and that as the two men stopped to converse, he "looked down where it should have been

21

and observed something." He identified what he saw as a cartridge, which is an unfired bullet still in its outer casing. When he saw the item, he looked "very startled," instructed the girlfriend's father not to move, and went to retrieve his camera from his car. Including the time spent looking through the house and photographing and subsequently collecting the cartridge, the trooper was at the girlfriend's property for approximately thirty minutes that night.

¶ 43. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," while Article 11 recognizes the people's right "to hold themselves, their houses, papers, and possessions, free from search or seizure" absent a warrant. U.S. Const. amend. IV; Vt. Const. ch. I art. 11. Simply stated, both provisions safeguard an individual's right to be free from unreasonable government intrusions into legitimate expectations of privacy. State v. Koenig, 2016 VT 65, ¶ 13, 202 Vt. 423, 148 A.3d 977; State v. Record, 150 Vt. 84, 85, 548 A.2d 422, 423 (1988) (recognizing that regardless of textual differences between state and federal constitutional provisions, "the word 'unreasonable' is implicit in Article Eleven as it is express in the Fourth Amendment"). Thus, an unconstitutional search occurs where the government—absent a warrant or circumstances manifesting an exception to the warrant requirement—infringes upon an expectation of privacy which society is prepared to recognize as reasonable. United States v. Jacobsen, 466 U.S. 109, 113 (1984); State v. Bryant, 2008 VT 39, ¶ 11, 183 Vt. 355, 950 A.2d 467. There was no such infringement here.

¶ 44. The home has always been acknowledged as an area in which persons have an eminently reasonable expectation of privacy. See Payton v. New York, 445 U.S. 573, 589 (1980) (explaining that Fourth Amendment zone of privacy is never "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home"); Silverman v. United States, 365 U.S. 505, 511 (1961) (recognizing that at Fourth Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion"); State v. Geraw, 173 Vt. 350, 352-53, 795 A.2d 1219, 1221 (2002) (recognizing, under

22

Article 11, "the significance of the home as a repository of heightened privacy expectations"). Within the sweep of the resulting constitutional protection falls the home's "curtilage," a legal term of art denoting the "area outside the physical confines of a house into which the privacies of life may extend." State v. Rogers, 161 Vt. 236, 241, 638 A.2d 569, 572 (1993) (quotation omitted). It isn't disputed that the area of the girlfriend's lawn in which the cartridge was recovered was part of the curtilage of her home and thus entitled to precisely "the same constitutional protection from unreasonable searches and seizures as the home itself." Id. (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).

¶ 45.    However, some portion of a home's curtilage necessarily furnishes "the normal route of access for anyone visiting the premises." 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (6th ed. 2020) (quotations omitted). Historically, "the knocker on the front door [has been] treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers[,] and peddlers for all kinds of salable articles." Breard v. City of Alexandria, 341 U.S. 622, 626 (1951). Pursuant to this implicit license, visitors seeking to contact the residents of a home may approach by the front path or driveway and knock on the door in hopes of being received. Florida v. Jardines, 569 U.S. 1, 8 (2013); State v. Pike, 143 Vt. 283, 287, 465 A.2d 1348, 1351 (1983) (recognizing that driveway is normal route of access for anyone visiting a home). "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Jardines, 569 U.S. at 8. Like Girl Scouts, trick-or-treaters, or any other private citizen, law enforcement officers with legitimate business may traverse a home's driveway to knock on the door, so long as they limit their movements "to the areas where the public would be expected to go." Koenig, 2016 VT 65, ¶ 17; see also Jardines, 169 U.S. at 8 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (quoting Kentucky v. King, 563 U.S. 452, 469 (2011))).

23

¶ 46.    Under the plain-view doctrine, "[w]hen the police come onto private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go" observations made from these vantages are not constitutionally protected.  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (6th ed. 2020).  This is so because there is no intrusion into a reasonable expectation of privacy—and therefore no search—where the "government observes that which is willingly exposed to the public."  State v. Bryant, 2008 VT 39, ¶ 13, 183 Vt. 355, 950 A.2d 467; Rogers, 161 Vt. at 244, 638 A.2d at 574 ("[W]hile an area may be within the curtilage, there still may be no constitutional protection if activity in that area is knowingly exposed to the public.").  Thus, an individual seeking to protect her privacy within the curtilage of her home must make that intention clear to visitors.  Bryant, 2008 VT 29, ¶ 13.  "Fences, gates, and no-trespassing signs generally suffice to apprise a person that the area is private."  Id.  Defendant does not dispute that no such indicia were present in the area of his girlfriend's lawn adjacent to her driveway.

¶ 47.    Defendant notes that the trial court's decision was predicated on our ruling under the Fourth Amendment in State v. Bovat and its discussion of "semiprivate areas," a decision subsequently criticized by three Justices of the United States Supreme Court in a statement accompanying its denial of the Bovat defendant's petition for a writ of certiorari.  Bovat v. Vermont, 592 U.S. __, 141 S. Ct. 22 (mem.); State v. Bovat, 2019 VT 81, ¶ 16, 211 Vt. 301, 224 A.3d 103.  Defendant also argues that two factors differentiate this case from those in which the plain-view exception to the warrant requirement apply: the trooper's subjective intent to look for the cartridge when he stopped in the driveway, and his use of a flashlight in doing so.  He does not, however, challenge the trooper's entry into the girlfriend's home as falling beyond the constitutionally permissible bounds of his inquiry into her welfare.  The only question is whether the trooper exceeded the scope of his license to be on the property for that purpose between the time he exited the home and when he left the property.  I conclude that he did not.

24

¶ 48. The sum of defendant's analysis under the Vermont Constitution is his observation, in a footnote, that where a search is unconstitutional under the federal Constitution it is necessarily violative of our state Constitution because Article 11 is more protective than the Fourth Amendment. While a correct statement of the law, this framing does not lend itself to meaningful consideration of the requirements of Article 11 to the extent they may differ from their federal counterpart when applied to this set of facts. See State v. Savva, 159 Vt. 75, 84, 616 A.2d 774, 779 (1991) (explaining that United States Supreme Court decisions "do not predetermine our interpretation of Vermont's search and seizure law under Article 11" which "may afford greater protection"). This Court "will not address state constitutional claims where they are insufficiently raised and inadequately briefed." State v. Brillon, 2010 VT 25, ¶ 5-6, 187 Vt. 444, 995 A.2d 557 ("Merely citing the Vermont Constitution, without providing any analysis of how the state constitutional provision compares with its federal analog, does not adequately present the issue for our review, especially where the argument was not presented in the trial court."); see also Trudell v. State, 2013 VT 18, ¶ 30, 193 Vt. 515, 71 A.3d 1235 (declining to address argument under state Constitution devoid of substantive analysis). Because defendant's argument is predicated entirely on cases decided under the Fourth Amendment, so, too, is our analysis. Thus, the facts of this case must be considered only against the requirements of the Fourth Amendment.

¶ 49. I turn first to the question of Bovat, which the majority finds necessary to clarify and, to an extent, overrule. In that case, game wardens investigating a possible deer-jacking were proceeding up the defendant's driveway when, through a window in his garage door, they observed what looked to be deer hair and blood on the tailgate of a pickup truck parked inside. We held that the officers' plain-view observations, made while traversing the curtilage of the defendant's home for a permissible purpose, did not violate the defendant's Fourth Amendment rights. Bovat, 2019 VT 81, ¶ 16. In the statement accompanying the Supreme Court's denial of Bovat's petition for a writ of certiorari, however, the facts were described differently: three Justices characterized the

25

wardens as "linger[ing] on the property for perhaps fifteen minutes" without ever "ma[king] it to the front door." Bovat v. Vermont, 592 U.S. at __, 141 S. Ct. at 23. The Justices noted that under Florida v. Jardines, "there exist no 'semiprivate areas' within the curtilage where governmental agents may roam from edge to edge." Id. at __, 141 S. Ct. at 24. The State argues that the Justices' statement was predicated on a misunderstanding of the record in Bovat, noting that its description of the wardens lingering on the property for fifteen minutes without making it to the front door did not square with facts as found by the trial court and applied by this Court. I do not view either version of the facts in Bovat—those found by the trial court or those later attributed to the case to determine the outcome here.

¶ 50. This is because, although the trial court drew its legal conclusions on the basis of our decision in Bovat, we need not do so to decide this case. Gilwee v. Town of Barre, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (explaining that we may affirm trial court decisions which although incorrectly reasoned, are correct as a matter of law). The facts of this case are distinct from the scenario invoked in the statement denying the writ of certiorari in Bovat: the trooper undisputedly did not linger outside defendant's girlfriend's home for up to fifteen minutes without making it to the front door, roam from edge to edge of her curtilage, or peer through the window of a closed outbuilding. They are also distinct from the trial-court record we relied upon in deciding Bovat. Here, in the course of lawfully proceeding down the driveway in darkness after being unable to locate the subject of the welfare check, the trooper stopped and was speaking with her father within four feet of his car when he looked down at the grass bordering the driveway—likely with the aid of his flashlight—and spotted the cartridge in plain view. We need not invoke the disputed concept of "semiprivate" areas, the officer was legally on the porch in the course of the welfare check, he has the right to return to his car without roaming or lingering. To hold that the officer exceeded the bounds of his license to enter under these circumstances is to place the officer in constitutional limbo as he tries to leave the premises. Had he discovered the cartridge

while walking up the driveway to conduct the welfare search it would be difficult to argue any constitutional violation had occurred. While there may come a case which calls upon us to revisit our reasoning in Bovat, it is not this one.

¶ 51. Defendant suggests that the trooper's admitted subjective intent to look for the cartridge on the lawn rendered his subsequent conduct an impermissible search. As the federal Supreme Court explained in Jardines, the "mere purpose of discovering information" in the course of a lawful entry onto property does not itself create a Fourth Amendment violation. 569 U.S. at 9 n.4, 10 (explaining that "a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with that validating reason"). Instead, the relevant question is whether the trooper's conduct "objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do" in the course of conducting a welfare check. Id. at 10.

¶ 52. Defendant contends that in "standing in the driveway . . . longer than needed to accomplish his purpose of conducting a welfare check," the trooper's conduct objectively revealed a purpose to conduct a search. I disagree. Pausing to exchange information with the father of a presumed-missing woman, who asked him a question related to events directly preceding her disappearance was both reasonable and consonant with the lawful purpose for which the officer was on the property—to conduct a welfare check. Cf. State v. Marcello, 157 Vt. 657, 658, 599 A.2d 357, 358 (1991) (mem.) (explaining that in some circumstances "police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking' functions to enhance public safety . . . . The key to such constitutionally permissible police action is reasonableness" (citation omitted)). The officer's actions in this regard did not "objectively reveal[] a purpose to conduct a search." Jardines, 569 U.S. at 10. The trooper did not linger, sifting through the homeowner's lawn on his hands and knees. He did not wander about the premises; indeed, he did not deviate from the route he was following down the driveway.

27

Rather, in the act of leaving the property, he stopped, in very close proximity to the open door of his car, to speak with the father of the woman who was the subject of his welfare check as the two men prepared to leave in their separate vehicles. Because the trooper's conduct fell "in the category of 'permitted' " in the course of the welfare check he was performing, his "gathering of information 'in the course of engaging in' that conduct [was] also permissible." United States v. White, 928 F.3d 734, 740 (8th Cir. 2019).

¶ 53. Whatever the trooper's subjective motivation, his conduct, in the context of this welfare check, did not "objectively reveal a purpose to conduct a search." Jardines, 569 U.S. at 10. As the federal Supreme Court has explained,

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify [the challenged] action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law.

Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011) (quotations omitted); Scott v. United States, 436 U.S. 128, 136-37 (1978) (affirming that under the Fourth Amendment, an officer's "[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional"). Viewed objectively, the circumstances of this welfare check provide legal justification for the trooper's act in pausing in the driveway to speak with the girlfriend's concerned father. We do not read the Fourth Amendment to require that an officer leaving a property, after an unsuccessful attempt to contact its resident, keep his feet in continuous forward motion and his eyes closed or run afoul of constitutional protections.

¶ 54. The majority draws a contrary conclusion, reasoning that the trooper's actions objectively revealed an intent to search and therefore transgressed the bounds of what is constitutionally permissible in the context of a welfare check. However, its analysis on this point is undermined by two interrelated flaws.

¶ 55.    The first is its failure to consider the father's uncontroverted testimony about what else was happening at the time the trooper discovered the cartridge.  The majority finds it significant that while walking down the driveway, the officer stopped at the location where he believed he would find the cartridge—but overlooks the fact that this location was also within four feet of his open car door.  This context is essential to an objective view of the circumstances.  In the same vein, the majority does not acknowledge that at the time the officer noticed the cartridge, the trooper was responding to the father's inquiries about events which had summoned law enforcement to her home just prior to her apparent disappearance.  Such an act falls into the category of those which the majority characterizes as "intrinsic to the welfare check that gave [the trooper] limited constitutional authority to be present in the curtilage of the home in the first place." Ante, ¶ 31.  This permissible purpose is at the heart of my conclusion: where officers are lawfully present in a home's curtilage for such legitimate reason, "they are free to keep their eyes open." United States v. Reyes, 283 F.3d 446, 465 (2d Cir. 2002).

¶ 56.    The second problem with the majority's analysis is the inordinate weight it places on the trooper's candid testimony that he subjectively intended to look for the cartridge in the grass.  As set forth above, the federal Supreme Court has long made clear that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  Scott, 436 U.S. at 138.  To conclude, as the majority does here, that the trooper's actions "provide objective confirmation" of his admitted subjective purpose in looking at the grass, see ante, ¶ 31, muddies the waters of the objective inquiry the Constitution requires.  "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent."  Whren v. United States, 517 U.S. 806, 814 (1996).  If we allowed law enforcement's testimony about what was subjectively intended to color the requisite objective assessment of their actions, it would

29

undercut the important purposes that objective inquiry is designed to serve. See, e.g., <u>Horton v. California</u>, 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

¶ 57. In short, "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by . . . a valid exception to the warrant requirement." <u>Id</u>. Considered in light of the more complete picture painted by the testimony of both witnesses, I cannot conclude that the trooper's actions in casting his eye—or even the beam of his flashlight, see <u>infra</u> ¶ 59—upon the lawn while engaged in conduct reasonable in the context of this welfare check evinced an objective intent to search. The question then becomes whether the trooper's use of a flashlight transformed his plain-view observation into a search. Defendant analogizes the act of shining the flashlight at the grass to "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence"—conduct the Court found violated the Fourth Amendment in <u>Jardines</u> because it exceeded the scope of the implicit license pursuant to which officers were conducting a knock-and-talk. 569 U.S. at 9. There is no such equivalence here.

¶ 58. The Court's holding in <u>Jardines</u> was premised on the commonsense recognition that the implied license allowing an officer to approach the front entrance of a home and knock on the door does not afford him the latitude to roam the front entrance with a drug-sniffing police dog. <u>Id</u>. ("To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police."). As Justice Kagan observed in her concurrence, the officer's dog "was not your neighbor's pet, come to your porch on a leisurely stroll"; rather, "drug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to

convey clear and reliable information to their human partners." Id. at 12-13 (Kagan, J., concurring) ("They are to the poodle down the street as high-powered binoculars are to a piece of plain glass.").

¶ 59.   Conversely, it is not uncommon, and probably sensible, for any nighttime visitor approaching a home via its curtilage to use a flashlight, or to pause and briefly cast its beam upon the lawn bordering the driveway in doing so.  Such an act does not exceed the scope of the implicit license to approach the home.  Id.  Many courts have considered this question and arrived at the same conclusion: "When an officer's plain view observation of evidence during daylight would not constitute a search for purposes of the Fourth Amendment, the fact that the officer uses a flashlight because darkness has fallen does not transform the officer's observations into an unreasonable search."  People v. Glick, 250 P.3d 578, 585 (Colo. 2011) (en banc); see also, e.g., State v. Cobb, 566 P.2d 285, 289 (Ariz. 1977) (en banc) (noting that when "items are in plain view, the use of a flashlight by police to view them does not make the seizure a result of an unreasonable search" under the Fourth Amendment); United States v. Beierle, No. 13-CR-98-F, 2013 WL 12210170, *3 (D. Wyo. Aug. 20, 2013) (finding no Fourth Amendment violation under plain-view exception where officers, approaching defendant's shop to knock on door, "using a flashlight, saw shell casing sitting on a pile of snow in front of the shop door and around the driveway"), aff'd, 810 F.3d 1193 (10th Cir. 2016) (Fourth Amendment issue not on appeal).  This conclusion is logical: the darkness shrouding a home's curtilage at night is not a manifestation of its owner's (or a boyfriend's) wish for privacy, but rather a necessary incident of the Earth's orbit.  An officer entering the curtilage of a home after nightfall for a lawful purpose is not obligated to risk trampling the homeowner's flowerbeds or stumbling over an unseen object in order to avoid discovering, with aid of a flashlight, evidence which would be in his plain view in daylight.

¶ 60.   Although the trooper testified that he subjectively intended to look for the cartridge when he stopped in the driveway and looked down at the lawn with aid of a flashlight while speaking with the girlfriend's father, his actions were objectively reasonable in the context of

performing a welfare check which required him to walk to and from the entrance to the house. The trial court therefore correctly denied his motion to suppress evidence of the cartridge.

## B. Rule 403

¶ 61. Because I would find the denial of the motion to suppress proper, I reach the issue of whether the trial court erroneously admitted defendant's use of racially charged language.[9] The State noted that the deadline for defendant to file motions in limine to exclude evidence had passed, and that it intended to offer testimony that defendant used "racial-animus-related language" both toward the alleged victims and, later, within earshot of his probation officer. Defendant did not object to evidence that he used the term "boy" while speaking to the complaining witness but argued that the proffered testimony that he allegedly used the n-word while speaking about the encounter after the fact was both irrelevant and prejudicial. The court ruled that, applying the Vermont Rule of Evidence 403 standard, the evidence of what defendant's probation officer overhead was not unduly prejudicial to defendant.

¶ 62. At trial, the State indicated that it intended to offer testimony that defendant used "racial-animus-related language" both toward the alleged victims and, later, within earshot of his probation officer. Defendant did not object to evidence that he used the term "boy" while speaking to the complaining witness but argued that the proffered testimony that he allegedly used the n-word while speaking about the encounter after the fact was both irrelevant and prejudicial. The court ruled that, applying the Vermont Rule of Evidence 403 standard, the evidence of what defendant's probation officer overhead was not unduly prejudicial to defendant. At trial, the State called defendant's probation officer as its final witness. She testified that, while discussing the allegations underlying this case with defendant, he told her that he had to protect his girlfriend "from three black people." Later, she could hear him in the office adjacent to hers speaking with

---

[9] Because the majority reverses based upon its constitutional analysis, it is understandable why it did not fully address this issue.

someone else. He made the same statement, but instead used the n-word. Defendant argues that the trial court ran afoul of the Vermont Rules of Evidence in admitting his probation officer's testimony that defendant used the n-word in referring to the complaining witnesses following the altercation. The court below rejected defendant's argument that the evidence was "unduly prejudicial" to him under Rule 403, but did not expound further on its analysis. The trial court's evidentiary ruling should be reviewed with deference, reversing only where an abuse of discretion has resulted in prejudice. State v. Russell, 2011 VT 36, ¶ 6, 189 Vt. 632, 22 A.3d 455 (mem.). Absent a showing that the court abused or withheld its discretion, we will not disturb a court's reasonable rulings "even if another court might have reached a different conclusion." State v. Sarkisian-Kennedy, 2020 VT 6, ¶ 22, 211 Vt. 390, 227 A.3d 1007 (quotation omitted).

¶ 63. Subject to a number of limitations—constitutional, statutory, and otherwise—all "relevant" evidence is admissible. V.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." V.R.E. 401. Rule 403 describes several circumstances in which relevant evidence may be excluded, including where, as defendant asserts here, "its probative value is substantially outweighed by the danger of unfair prejudice." V.R.E. 403. "Trial courts do not have to specify the exact weight they assign to each factor during a Rule 403 analysis." State v. Longley, 2007 VT 101, ¶ 18, 182 Vt. 452, 939 A.2d 1028. As with all evidentiary rulings, balancing the Rule 403 factors "is a matter for the trial court's discretion, and we will ordinarily uphold its rulings." State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81; State v. Onorato, 171 Vt. 577, 579, 762 A.2d 858, 860 (2000) (mem.) (affirming Rule 403 balancing and noting "[a]lthough the trial court provided little amplification of the reasons for its decision, it is not required to state precisely why it found probative value to be substantially outweighed by prejudicial effect"). Because Vermont Rule of Evidence 403 is identical to its

federal counterpart, cases interpreting Federal Rule of Evidence 403—or state rules of evidence also derived from it—are particularly useful here. See Reporter's Notes, V.R.E. 403.

¶ 64. I cannot agree with defendant's position that the proffered evidence had no relevance in this case. At trial, defendant argued that the alleged victims' testimony regarding the encounter outside defendant's girlfriend's home was not credible, while his girlfriend's and friend's accounts were. The latter statements painted the alleged victims, on the day of the alleged offense, as aggressive and "very threatening" toward defendant's girlfriend, while defendant, protecting his girlfriend, simply directed them to leave the property. Evidence of defendant's use of the n-word was probative in that it made the State's version of events—a version in which defendant was an aggressor in the confrontation—more likely. This is so because the language he employed evinced a deep-seated hostility toward the alleged victims. See, e.g., People v. Quartermain, 941 P.2d 788, 804 (Cal. 1997) ("Expressions of racial animus by a defendant towards the victim and the victim's race, like any other expression of enmity by an accused murderer towards the victim, is relevant evidence in a murder or murder conspiracy case."); State v. Lipka, 413 P.3d 993, 995 (Or. Ct. App. 2018) (affirming decision to admit evidence under Rule 403 equivalent that after his arrest, defendant used the n-word toward a black officer because it "was indicative of his state of mind" and "suggested a motive for his actions" in resisting arrest); see also Reporter's Notes, V.R.E. 401 ("The test of relevancy is . . . not whether the evidence makes the proposition for which it is offered more probable than competing propositions, but rather whether the evidence has any tendency to establish (or refute) the proposition"); McCormick on Evidence § 185, at 438 (2d ed. 1972) (explaining that relevant evidence "is evidence that in some degree advances the inquiry, and thus has probative value").

¶ 65. Because the evidence is therefore relevant, the next step is to make the measure of the accompanying risk of unfair prejudice under Rule 403. All relevant evidence is fundamentally prejudicial in the sense that it may prejudice the party against whom it is admitted; however, Rule

34

403 concerns itself solely with the risk of <u>unfair</u> prejudice—"[t]hat is, the possibility that the evidence will excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it." <u>Mullen v. Princess Anne Volunteer Fire Co.</u>, 853 F.2d 1130, 1134 (4th Cir. 1988). Thus, evidence is considered unfairly prejudicial to a criminal defendant when its primary purpose is "to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." <u>Brillon</u>, 2010 VT 25, ¶ 16 (quotation omitted). The term at issue here "ranks as almost certainly the most offensive and inflammatory racial slur in English, a term expressive of hatred and bigotry." [n-word], Merriam-Webster Dictionary, https://perma.cc/WCV9-W4LU; <u>Mullen</u>, 853 F.2d at 1133 (observing that "[t]he user of such terms intends only one thing: to degrade those whom he describes in the most offensive manner"). Thus, testimony that defendant used this word in describing the alleged victims "is certain to be emotionally charged" for the jury. <u>Mullen</u>, 853 F.2d at 1134. The court must weigh this risk against the probative value of the subject evidence.

¶ 66.   Broadly speaking, "[e]ven where the probative value of the evidence is 'low,' the prejudice occasioned by derogatory language is generally insufficient to warrant exclusion." <u>United States v. Al-Din</u>, 631 F. App'x 313, 323 (6th Cir. 2015) (finding no plain error in district court's admission of letter written by defendant containing "frequent use[] of the [n-]word" under Federal Rule of Evidence 403). I find the point well-stated by the Oregon Court of Appeals:

> Jurors can, in some circumstances, properly consider evidence of caustic language with the other evidence presented . . . without giving it undue weight or being so affected as to decide the case in an improper manner. . . . That a juror may have to work hard to check her or his own assumptions and prejudices at the courthouse door in order to render a fair and impartial verdict does not require the exclusion of racially charged words from being entered into evidence[] where . . . the evidence has probative value that is not substantially outweighed by the risk of unfair prejudice.

Lipka, 413 P.3d at 996. Just so here. Although it may have been best practice for the trial court to be more explicit in explaining its ruling under the Rule 403 balancing test, it did not abuse or withhold its discretion here in concluding that the probative value of the probation officer's testimony was not substantially outweighed by the risk that it would unfairly prejudice defendant. His argument is therefore without merit.

¶ 67.    Because the motion to suppress was properly denied and the court did not abuse its discretion in admitting the racial animus testimony, I would affirm defendant's convictions.

¶ 68.    I am authorized to state that Justice Carroll joins this dissent.

_____

Associate Justice